IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| PENELOPE LYNCH, | § | |
| Plaintiff, | § | CIVIL ACTION NO. 3:05-CV-0931-P |
| v. | § | |
| BAYLOR UNIVERSITY MEDICAL CENTER, | § | |
| Defendant. | § | |

**MEMORANDUM OPINION AND ORDER**

Presently pending before the Court is Defendant's Motion for Summary Judgment, filed May 24, 2006. Plaintiff filed a Response on June 13, 2006, and Defendant submitted a Reply on June 26, 2006. Also pending before the Court is Plaintiff's Motion for Leave to file Surreply, filed July 5, 2006. Defendant did not indicate that it was opposed to this motion. Furthermore, the Court finds the motion is well taken,[1] thus Plaintiff's Motion for Leave to file Surreply is hereby GRANTED. After a thorough review of the parties' arguments, the pleadings, and the applicable law, the Court hereby GRANTS Defendant's Motion for Summary Judgment.

[1] The Surreply is limited to a response of Defendant's discussion of *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. ----, 126 S. Ct. 2405 (June 22, 2006). The Supreme Court issued the *Burlington* opinion after Plaintiff's Response was filed with this Court, thus it is reasonable to allow a surreply to discuss the case.

## I. Introduction

This employment discrimination case stems from Baylor University Medical Center's ("Defendant" or "Baylor") decision to terminate Penelope Lynch ("Plaintiff" or "Lynch") after nearly twenty years of employment.

Lynch was originally hired by Baylor as a staff nurse in December of 1984. Two years later, Plaintiff was promoted to the position of weekend nurse supervisor. (Def.'s App. at 20.) Plaintiff continued to work as a weekend nurse supervisor until her termination on June 15, 2004. (Def.'s Mot. at 3.) Plaintiff is a lesbian, and claims that her beliefs about gender and religion conflicted with the beliefs of a subordinate, registered nurse Rhonda Walthall ("Walthall"), and such beliefs caused her termination. According to Plaintiff, her ultimate demise was precipitated by a confrontation she had with Walthall on or about May 30, 2004. On that date, Plaintiff and Walthall were both working their normal weekend shifts. According to Lynch's deposition testimony,[2] she was on the phone at the nurse's station in the presence of Walthall and Dr. Brennan, a doctor in the psychiatry division. After ending the phone conversation, Plaintiff remarked that the caller "had a nice voice." (Def.'s App. at 30.) Plaintiff and Dr. Brennan then exchanged joking comments with an admittedly sexual undertone. (*Id.*) Walthall then became uncomfortable with the conversation and, according to her own deposition, said "Can I barf now?" (Pl.'s App. at 36.) In response, Plaintiff states that she tried to shift the subject of the conversation "to make everybody comfortable" by making a joke about

---

[2] Walthall's version of the relevant events is somewhat different, but for the purposes of summary judgment the Court must resolve all factual disputes in favor of Plaintiff, the non-movant. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000). However, the basic chain of events does not differ significantly in Lynch or Walthall's deposition testimony.

gay marriage in Massachusetts. (Def.'s App. at 33.) Walthall further expressed her disgust with the topic of conversation. At this point, Plaintiff testifies that she became offended and felt Walthall was making "a very obvious statement about the wrongness of gay marriage." (*Id.* at 35.) After this brief episode, Plaintiff states that all employees dispersed back to their work. (*Id.* at 36.)

Later that day, Plaintiff approached Walthall to apologize, clarify the previous confrontation, and restore a professional working relationship. (*Id.* at 37.) In an attempt to diffuse the situation, Plaintiff asked Walthall what it was about the earlier situation that upset her. Walthall then shared some of her religious beliefs and past experiences. Walthall stated that, in college, a female friend tried to force her into an unwanted sexual situation and that such event somewhat colored her opinion of homosexuals, causing her to react adversely to the situation at the nurse's station. (*Id.* at 40.) In response to Lynch sharing her views on religion, Walthall further stated that her religious beliefs led her to believe that Lynch was not following God's plan.

Soon after this incident, Walthall called the ethics hotline to voice her concerns. (Pl.'s App. at 14.) According to the deposition of Wendie Carlson, the director of human resources at Baylor, Walthall called to give her account of the confrontation because she feared retaliation from Plaintiff, her supervisor. (*Id.*) Walthall's call triggered an investigation of Plaintiff. (*Id.* at 15-16.) Such investigation revealed numerous instances of unacceptable behavior that indicated an overall failure to perform duties as a supervisor. (Def.'s App. at 54-55.) The investigation resulted in Plaintiff's termination on June 15, 2004. (*Id.* at 19.)

Thereafter, on June 28, 2004, Plaintiff filed a complaint of discrimination with the City of Dallas Fair Housing Office. On the same day, Plaintiff requested a grievance committee review under Defendant's internal grievance procedure, the Fair Treatment Policy. On July 13, 2004, Defendant denied this request. As a result, Plaintiff brings the instant action. Plaintiff claims that she was fired because of the gender stereotypes and religious bias of her subordinate Walthall. Plaintiff further asserts a claim for retaliation, contending that she was denied the opportunity to participate in an internal grievance procedure because she had filed complaints with the Dallas Fair Housing Office. Defendants now move for summary judgment, arguing that Plaintiff fails to establish a prima facie case on any of her claims.

## II. Summary Judgment Standard

Summary judgment shall be rendered when the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). All evidence and the reasonable inferences to be drawn therefrom must be viewed in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). The moving party bears the burden of informing the district court of the basis for its belief that there is an absence of a genuine issue for trial, and of identifying those portions of the record that demonstrate such an absence. *Celotex*, 477 U.S. at 323.

Once the moving party has made an initial showing, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact

issue. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The party defending against the motion for summary judgment cannot defeat the motion unless she provides specific facts that show the case presents a genuine issue of material fact, such that a reasonable jury might return a verdict in her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Mere assertions of a factual dispute unsupported by probative evidence will not prevent summary judgment. *Id.* at 248-50; *Abbott v. Equity Group*, 2 F.3d 613, 619 (5th Cir. 1993). In other words, conclusory statements, speculation and unsubstantiated assertions will not suffice to defeat a motion for summary judgment. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc). If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to her case, and on which she bears the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23. Finally, the Court has no duty to search the record for triable issues. *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

## III. Analysis

Plaintiff initially argues that Walthall's beliefs and comments in the workplace constitute direct evidence of discrimination based on gender and religion. In particular, Plaintiff asserts that Walthall openly discussed her faith, admitted that she had to pray before accepting a position working for a lesbian supervisor, and stated her belief that being gay was not part of God's plan for Plaintiff's life. (Pl.'s Resp. at 21.) Plaintiff further cites to deposition testimony and claims that Walthall's call to the ethics hotline after the confrontation at the nurses' station was the "triggering event" that led to Plaintiff's termination. (*Id.*)

"Direct evidence of discrimination is evidence which, if believed, would prove the existence of a fact (*i.e.*, unlawful discrimination) *without any inferences or presumptions*." *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 40 (5th Cir. 1996) (emphasis in original) (citations omitted). Even assuming the above comments are true, they do not definitively prove that Plaintiff was terminated because of her gender or religion. All the comments conclusively show is that Plaintiff and Walthall, her subordinate, had differing opinions on certain matters. Viewed in the context in which they were spoken, Walthall's comments are even more innocuous.[3] Furthermore, the deposition testimony cited by Plaintiff does not indicate that Walthall's call to the ethics hotline necessarily caused Plaintiff's termination. Instead, Plaintiff's manager Connie Bowling states that the incident with Walthall at the nurses' station was the triggering event for her *investigation*. (Pl.'s App. at 26.) Only with the use of inference could one conclude that the phone call triggered the termination. As Plaintiff's evidence is insufficient to establish, without any inferences, that a protected category was a factor in Baylor's decision to terminate her, Plaintiff cannot proceed under the direct evidence analysis.

Absent direct evidence of discrimination, as in the present case, Plaintiff's employment discrimination claims are analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000). Under the *McDonnell Douglas* framework, Plaintiff must first establish, by a preponderance of the evidence, a prima facie case of discrimination in order to

---

[3] Most of these comments were made during a private conversation after the incident at the nurses' station. (App. Def.'s Mot. at 38-45.) Walthall explained that she was shaken up over the confrontation because she had had a traumatic experience in college when one of her female friends tried to force her into a sexual situation. Only after revealing these issues from her past did Walthall admit that she had to pray about working for a lesbian supervisor.

survive Defendant's Motion for Summary Judgment. The prima facie case, once established, raises a presumption of discrimination which the Defendant must rebut by articulating a legitimate, nondiscriminatory reason for the adverse employment action. *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 680 (5th Cir. 2001). This burden on the employer is only one of production, not persuasion, involving no credibility assessments. *Russell*, 235 F.3d at 222. If the employer carries its burden, the mandatory inference of discrimination created by the prima facie case disappears. *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 350 (5th Cir. 2005). In order to survive summary judgment, a plaintiff must then raise a genuine issue of material fact as to whether the employer's proffered reason was merely pretext for discrimination. *See id.*; *Sandstad v. CB Richard Ellis, Inc.,* 309 F.3d 893, 897 (5th Cir. 2002). Plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justifications are false, may show pretext and permit the trier of fact to find the employer unlawfully discriminated. *Machinchick*, 398 F.3d at 351; *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000).

**a. Gender Discrimination**

To survive summary judgment on her gender- based termination claim, Plaintiff must first establish a prima facie case. To meet the prima facie case, Plaintiff must show that: (1) she is a member of a protected class, (2) she was qualified for her position, (3) she suffered an adverse employment action, and (4) she was replaced by someone outside the protected class, or, that others similarly situated were treated more favorably. *Septimus v. Univ. of Houston*, 399 F.3d 601, 609 (5th Cir. 2005). When the employer does not replace the plaintiff, the fourth

element requires the plaintiff to show that others who are not in the protected class remained in similar positions. *Bauer v. Abemarle*, 169 F.3d 962, 966 (5th Cir. 1999).

Defendant does not dispute that Plaintiff can meet the first three elements of a prima facie case:[4] she is a female, she was qualified to be a nurse's supervisor, and she was terminated from this position. In its motion for summary judgment, Defendant claims that Plaintiff cannot demonstrate that she was replaced by someone outside the protected class or that others similarly situated were treated more favorably. Plaintiff does not respond to this argument. In her complaint, Plaintiff claims that "[s]imilarly situated employees who were not judged by gender stereotypes were more favorably treated," but fails to offer any evidence in support of this fourth element. (Compl. at 8, ¶¶ 17.) In response to Defendant's motion for summary judgment, Plaintiff claims that Walthall's comments constitute direct evidence, thereby foregoing any argument relating to circumstantial evidence. As noted above, the Court finds that Walthall's comments cannot be considered direct evidence. Thus, Plaintiff has failed to present evidence on each element of her prima facie case. When the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to her case, and on which she bears the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23.

Even if the Court were to assume that Plaintiff could meet the prima facie case, Plaintiff ultimately fails to allege that discrimination occurred "because of . . . sex." 42 U.S.C. § 2000e-2(a)(1); *see also Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) ("Whatever

[4] As will be discussed in more detail later, Plaintiff's gender discrimination claim actually appears to be a discrimination claim based on sexual orientation. Thus, Plaintiff cannot satisfy the first element of the prima facie case because Title VII does not recognize homosexuals as a protected class. *E.g.*, *Dawson v. Bumble & Bumble*, 398 F.3d 211, 218 (2d Cir. 2005).

evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted '*discrimina[tion]* . . . because of . . .sex.'"). Plaintiff's gender discrimination claim is initially weakened by the fact that she was hired and fired solely by females. Plaintiff was hired by Connie Bowling, a female. During her entire tenure, Plaintiff worked under the supervision of Ms. Bowling, and on at least one occasion was promoted by her. (Def.'s App. at 20.) In affidavit testimony, Bowling states that she made the decision to terminate Plaintiff. (*Id.* at 55.) Plaintiff disputes this assertion, and provides deposition testimony indicating that the decision to terminate Plaintiff was not unilaterally made by Bowling; rather it was a joint decision made by Bowling, Wendie Carlson, and Sue Sayers based on the complaints of Walthall. (Pl.'s App. at 16, 17.) But this point is immaterial; under either scenario the decision to terminate Plaintiff was made solely by females- persons within Plaintiff's protected class. The fact that the actors involved in the decision to hire and terminate were all members of the protected class "enhances the inference" that gender discrimination was not the motive behind the termination. *See Brown v. CSC Logic, Inc.*, 82 F.3d 651, 658 (5th Cir. 1996) (citing *LeBlanc v. Great American Ins. Co.*, 6 F.3d 836, 847 (1st Cir. 1993)).

But it appears that Plaintiff is attempting to proceed on the theory that she was discriminated against because of gender stereotypes. (*See* Compl. at 7, ¶ 16.) ("Baylor terminated Ms. Lynch because of Ms. Walthall's gender stereotypes regarding femininity.") After the Supreme Court's decision in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), courts have regularly recognized a cause of action under Title VII based on discrimination for failure to

conform to gender stereotypes. *E.g., Schroer v. Billington*, 424 F. Supp. 2d 203, 208 (D. D.C. 2006) (citing cases). In *Price Waterhouse*, the Court held that the plaintiff was not discriminated against merely for being a woman, but for failing to *act* like a woman. *See Price Waterhouse*, 490 U.S. at 235 (finding discrimination under Title VII where employer told plaintiff she could improve her chances of making partner if she would "walk more femininely, talk more femininely, dress more femininely, have her hair styled, and wear jewelry"). The Court found that, in enacting Title VII, "Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes," thus Title VII encompassed protections against gender stereotypes. *Id.* at 228. But courts have cautioned that "the actual holding of *Price Waterhouse* is considerably more narrow than its sweeping language suggests." *Schroer*, 424 F. Supp. 2d at 209. For example, the holding of *Price Waterhouse* did not create a protected class under Title VII for sexual orientation. The law is well-settled in every circuit to have addressed the issue- Title VII does not recognize a cause of action for discrimination based on sexual orientation. *Dawson v. Bumble & Bumble*, 398 F.3d 211, 218 (2nd Cir. 2005); *see also Blum v. Gulf Oil Corp.*, 597 F.2d 936, 938 (5th Cir. 1979). As such, when an admitted homosexual brings suit under a gender stereotype theory, courts scrutinize such claim to ensure that it is not "used to bootstrap protection for sexual orientation into Title VII." *Dawson*, 398 F.3d at 218.

At a minimum, courts require that a victim of gender stereotyping allege facts demonstrating that they were discriminated against for their failure to conform to gender stereotypes. "Generally speaking, one can fail to conform to gender stereotypes in two ways: (1)

through behavior or (2) through appearance." *Dawson*, 398 F.3d at 221; *see also Smith v. City of Salem, Ohio*, 378 F.3d 566, 574 (6th Cir. 2004) (finding plaintiff had stated valid claim of gender stereotype discrimination when complaint alleged that the defendants' discrimination was motivated by his appearance and mannerisms). In the instant case, Plaintiff has made no showing that her non-conforming appearance or behavior impacted the decision to terminate her. There is no allegation and no evidence that Plaintiff was subject to discrimination for failing to dress, behave, or "act" like a woman.[5] Defendant knew Plaintiff was a lesbian for the majority of the twenty years she was employed. During this time, Plaintiff received a promotion and was granted a favorable lateral transfer; there is no evidence that her employer expected her to conform to any gender stereotype. Rather, the evidence shows that an investigation was triggered when Plaintiff failed to meet Defendant's expectations for a supervisor. The events that precipitated her termination had nothing to do with gender; she was investigated because of coarse sexual joking and the manner in which she handled the incident following the confrontation with Walthall. Plaintiff's actions made subordinates uncomfortable and created tension in the workplace. There is no evidence that male supervisors or more feminine-acting supervisors were treated any differently.

---

[5] Plaintiff's only attempt to provide evidence on this point is the allegation that Walthall considered Plaintiff to be more "masculine." But this evidence is insufficient for numerous reasons. First, Plaintiff has failed to convince the court that Walthall, as a subordinate, played a prominent role in the decision to terminate her. Walthall's call to the ethics hotline triggered an investigation. It was the resulting investigation and findings of Connie Bowling, Sue Sayers, and Wendie Carlson that caused the termination. Second, Walthall's statement in deposition that Plaintiff was more "masculine" was in response to the question "was [Plaintiff] more masculine or was she more feminine in her mannerisms?" (App. Pl.'s Resp. at 38.) Walthall answered: "She was probably more masculine." (*Id.*) It was simply an answer to a specific question at a deposition. The fact that she answered "masculine" rather than "feminine" does not support an inference that Walthall made the call to the ethics hotline because Plaintiff did not conform to gender stereotypes. In fact, counsel for Plaintiff asked Walthall if she had a problem with Plaintiff being masculine. (*Id.*) Walthall stated that it "wasn't my business." (*Id.*)

Furthermore, Plaintiff alleges that she was terminated because of a subordinate's gender stereotypes. But there is no evidence that Walthall influenced or had any leverage on the decision to terminate Plaintiff. Plaintiff strenuously argues that Walthall exerted influence over the decision-makers, but offers nothing more than her own allegations to support this argument. In such cases, "courts will not blindly accept the titular decisionmaker as the true decisionmaker . . . [but instead will] look to who actually made the decision or caused the decision to be made." *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 227 (5th Cir. 2000). In the present case, however, Plaintiff has introduced no evidence that would suggest Walthall was the informal decisionmaker or contributed in any significant way to the termination. It is undisputed that Walthall called in to the ethics hotline. But this call alone is insufficient to raise an issue as to Walthall's influence over the termination. Rather, her call merely led to an investigation. The evidence is clear that it was the results of the investigation, not the initial call, that caused Plaintiff's termination.

In sum, the motivation behind the termination does "not rely upon her gender and, as such, [is] not within the ambit of Title VII's protections." *Ellert v. Univ. of Texas at Dallas*, 52 F.3d 543, 546 (5th Cir. 1995). Plaintiff's failure to allege any facts or provide any argument regarding her non-conformance with her employer's expectations leads the Court to believe that her actual claim is for discrimination based on sexual orientation. As sexual orientation is not a protected class under Title VII, Plaintiff fails to meet the first element of a prima facie case.

**b. Religious Discrimination**

As the Court finds that Plaintiff has not presented direct evidence of religious discrimination, Plaintiff's claims are likewise analyzed under the *McDonnell Douglas* approach and Plaintiff must first establish a prima facie case. A prima facie case may be established by a showing that the plaintiff was (1) a member of an identifiable religion; (2) that she was qualified for the position; (3) that she suffered an adverse employment decision; and (4) that the adverse employment decision was differentially applied to plaintiff.[6] *See Rubinstein v. Adm'rs of Tulane Educ. Fund*, 218 F.3d 392, 399 (5th Cir. 2000).

In its summary judgment briefing, Defendant asserts that Plaintiff has produced no evidence on the fourth element. Like her gender discrimination claims, Plaintiff argues that she has shown direct evidence of discrimination and does not respond to Defendant's argument. In her complaint, Plaintiff claims that "[s]imilarly situated employees who did not hold Ms. Lynch's religious beliefs were treated more favorably." (Compl. at 8, ¶¶ 21.) But in her summary judgment briefing, Plaintiff does not identify any evidence in the record that would show differential treatment. Plaintiff does not identify a single employee, other than Walthall, who was treated more favorably. But Walthall is Plaintiff's subordinate; in order to raise an inference of discrimination and meet the fourth prong of the prima facie case, Plaintiff must show that

---

[6] To the extent Plaintiff attempts to bring a discrimination claim based on her employer's failure to accommodate her religious beliefs, Plaintiff fails to satisfy the prima facie case. Under this formulation, "[t]o establish a prima facie case of religious discrimination under Title VII, a plaintiff must establish that [s]he had a *bona fide* religious belief that conflicted with an employment requirement, that [s]he informed the employer of h[er] belief, and that [s]he was discharged for failing to comply with the conflicting employment requirement." *Weber v. Roadway Exp., Inc.*, 199 F.3d 270, 273 (5th Cir. 2000). Plaintiff has not presented evidence on any of these elements.

preferential treatment was given to similarly situated employees in "nearly identical" circumstances. *Bryant v. Compass Group USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005). Defendant has submitted evidence demonstrating, *inter alia*, that Plaintiff had poor personal boundaries with subordinates, engaged in inappropriate sexual discussions in the workplace, abused her position of authority by making jokes about a subordinate, asked subordinates to falsify documents, and generally failed to perform her duties as a supervisor. (Def.'s App. at 54-55.) Plaintiff has failed in her burden of showing "that the misconduct for which the plaintiff was discharged was nearly identical to that engaged in by other employees." *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 514 (5th Cir. 2001) (citations omitted). There is no evidence that would suggest Walthall would have received different treatment had she been a supervisor engaged in similar activities. Thus, Plaintiff cannot meet her prima facie case.

In addition, as Plaintiff's religious discrimination claims are admittedly based on the religious beliefs of a subordinate, Plaintiff must demonstrate that her subordinate had some type of influence or leverage over the decisionmaker. As noted above, the Court finds that Plaintiff fails to show how Walthall exerted any influence over the ultimate decisionmakers. Walthall merely made a call to the ethics hotline, and such call led to an investigation of Plaintiff. Based on the evidence submitted by Plaintiff, no reasonable juror could find that Walthall's religious beliefs affected the decision to terminate Plaintiff.

Even if the Court were to assume that Plaintiff could establish a prima facie case, Defendant has articulated a host of legitimate, non-discriminatory reasons for the termination. (*See* Def.'s App. at 54-55.) As such, the burden shifts to Plaintiff to present evidence that such

reasons are merely pretext for the genuine discriminatory reason. Plaintiff argues that her performance reviews consistently showed that she "meets expectations," yet the results of the investigation showed multiple deficiencies that were previously undocumented. Plaintiff asserts that such a disparity in rankings demonstrates pretext. But after review of the record, it appears that most of the issues that contributed to Plaintiff's termination were not discovered until the investigation. In affidavit, Bowling states that she discovered Plaintiff was not properly supervising Edward Flynn because he had a close relationship with Plaintiff. (Def.'s App. at 53.) Bowling further states that several nurses informed her that Plaintiff had asked them to falsify certain patient charts. (*Id.* at 53-54.) According to Bowling, the interviews she conducted during the investigation also corroborated Walthall's version of the confrontation. In addition, Plaintiff had received verbal warnings in the past regarding her use of profanity in the workplace. (*Id.* at 52-53.) As a result of all these factors, Bowling believed that Plaintiff had displayed poor management over her subordinates on several occasions. There is no evidence that suggests any of Plaintiff's subordinates had made previous complaints, thus the fact that these issues were not recognized by earlier performance reviews does not support a finding of pretext. As such, summary judgment is proper.

**c. Retaliation**

Plaintiff also claims that Defendant retaliated against her in violation of Title VII by refusing her request to participate in Defendant's internal grievance procedure. Plaintiff was terminated on June 15, 2004. Thereafter, on June 28, 2004, Plaintiff filed a complaint of discrimination with the City of Dallas Fair Housing Office. On the same day, Plaintiff requested

a grievance committee review under Defendant's internal grievance procedure, the Fair Treatment Policy. On July 13, 2004, Defendant denied this request. Counsel for Defendant stated that, because Plaintiff had filed a complaint with the City of Dallas Fair Housing Office, Defendant declined Plaintiff's request to access to the Fair Treatment Policy. (Pl.'s App. at 39-40.)

The Fair Treatment Policy is Defendant's informal method of resolving employment disputes. The goal of the Fair Treatment Policy is to provide employees an avenue to have "employment concerns reviewed and answered in a timely manner." (Pl.'s App. at 41.) The Fair Treatment Policy allows an employee to have an employment decision reviewed by a panel of three hospital employees. The review generally consists of a four hour hearing whereby the aggrieved employee and the other party to the dispute can present their cases, call witnesses, and submit relevant documents to the panel. (Pl.'s Resp. at 6.) After the hearing, the panel has the authority to recommend that the employment action taken be reversed or upheld. (Pl.'s App. at 42.) This recommendation is given to the CEO of Baylor, who will make a final, binding decision. The Fair Treatment Policy is available to all employees, however, no employee has a contractual right to such grievance proceeding. (Def.'s App. at 49.)

To establish a prima facie case of retaliation under Title VII, Plaintiff must demonstrate that she: (1) engaged in a protected activity; (2) that an adverse employment action occurred; and (3) that a causal link exists between the protected activity and the adverse employment action. *Banks v. E. Baton Rouge Parish Sch. Bd.*, 320 F.3d 570, 575 (5th Cir. 2003). Defendant asserts that Plaintiff cannot establish a retaliation claim, as the denial of the internal grievance procedure

was not an adverse employment action.[7] According to the Supreme Court's recent holding in *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. ----, 126 S. Ct. 2405 (June 22, 2006), a materially adverse employment action is any action which "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *White*, 126 S. Ct. at 2415 (citations omitted). The Supreme Court stated that it "phrase[d] the standard in general terms because the significance of any given act of retaliation will often depend on the particular circumstances." *Id.* Plaintiff argues that the denial of her right to an internal grievance procedure significantly alters the terms and conditions of her employment such that it rises to the level of an adverse employment action.

But after consideration of the circumstances surrounding the instant case, the Court is not persuaded that Baylor's actions constitute retaliation. The Court finds the facts of the present case analogous to the situation presented in *United States v. New York City Transit Authority*, 97 F.3d 672 (2d Cir. 1996). In *New York City Transit Authority*, the employer had an internal Equal Employment Opportunity Division ("EEO Division") that handled employee discrimination complaints through informal mediation and settlement proceedings. 97 F.3d at 674. However, once an employee filed a complaint with an external anti-discrimination agency, the EEO Division refused to intervene and the complaint was referred to the Transit Authority's legal department. *Id.* The United States Equal Employment Opportunity Commission ("EEOC") became aware of this policy and brought suit, alleging that the policy was a form of retaliation in violation of Title VII. *Id.*

---

[7] Plaintiff's retaliation claim is premised solely on Defendant's refusal to grant her access to its internal grievance procedure. (Def.'s App. at 48.)

After review, the Second Circuit characterized the Transit Authority's policy as a "reasonable defensive measure" that did not violate the anti-retaliation provisions of Title VII. *Id.* at 677. The court found that holding otherwise would force an employer to litigate in "parallel and duplicative proceedings." *Id.* Furthermore, it could impair an employer's ability to defend itself in a claim of discrimination, as findings in an internal proceeding could prejudice it in external proceedings. *Id.* at 678. Ultimately, the court found that the differential treatment of employees who had filed an external complaint was not retaliation in violation of Title VII, but a logical shift in dispute resolution tactics. *Id.* Legitimate business reasons supported the policy.

The same reasoning applies to the instant case. Defendant's decision not to allow Plaintiff to participate in the internal grievance proceedings was not a retaliatory action because it would not have dissuaded a reasonable employee from making a charge of discrimination.[8] Rather, it was a reasonable defensive measure and an attempt to avoid parallel and duplicative proceedings. Baylor's policy of not allowing a dispute to proceed simultaneously in two different forums does not operate to prevent the filing of discrimination complaints. It simply requires an employee to use the proceedings sequentially rather than simultaneously. The policy is further supported by legitimate business reasons. If an employee elected to utilize Defendant's internal grievance procedure and obtained the desired relief, there would be no need for further proceedings or investigations by an outside agency. If, however, an employee did not obtain the

---

[8] While not squarely addressed by the Fifth Circuit, several decisions indicate that the denial of an internal grievance procedure does not constitute an adverse employment action. *See, e.g.*, *Gregory v. Texas Youth Commission*, 111 Fed. Appx. 719, 721 (5th Cir. 2004); *Messer v. Meno*, 130 F.3d 130, 140 (5th Cir. 1997); *Dupre v. Harris County Hosp. Dist.*, 8 F. Supp. 2d 908, 924-25 (S.D. Tex. 1998).

requested relief through the internal grievance proceedings, the employee could still file an EEOC complaint.[9]

Additionally, the Supreme Court held that "[t]he anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *White*, 126 S. Ct. at 2414. Plaintiff suffered no harm from her inability to use Defendant's internal grievance procedure. By filing an EEOC complaint, Plaintiff could secure all the relief available from the internal grievance plus additional relief not available through Defendant's procedure. For all these reasons, Plaintiff is unable to sustain her claim of retaliation and summary judgment is proper.

## IV. Conclusion

For the foregoing reasons, the Court GRANTS Defendant's Motion for Summary Judgment.

**It is so ordered**.

Signed this 23rd day of August 2006.

Jorge A. Solis
JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE

[9] In addition, Plaintiff did not have a contractual right to the internal grievance procedure. The *New York City Transit Authority* court distinguished *Johnson v. Palma*, 931 F.2d 203 (2d Cir. 1991), a case cited by Plaintiff, on this particular point. In *Johnson*, the court held that the abandonment of a grievance that the union has a contractual responsibility to pursue on the employee's behalf amounts to an adverse employment action. *New York City Transit Authority*, 97 F.3d at 678 (citing *Johnson*, 931 F.2d at 207.). But where an employer is not contractually bound to offer internal grievance procedures, it "is free under Title VII to decide for itself how it will address or resolve employee complaints of discrimination." *New York City Transit Authority*, 97 F.3d at 678.